The next case on our call this morning is Agenda No. 16, Case No. 104-772, Robert L. Elderson, et al. v. Leo E. Fatlan, et al. Mr. Ruck, is it Ruck or Buck? Buck. Mr. Buck, you're in the opposite end of the spectrum here, but all right, we'll do it this way this time. Mr. Buck, you may proceed. Thank you, Your Honor. Mr. Chief Justice, may it please the Court, members of the Supreme Court, Mr. Stevenson. Good morning. My name is Carl Buck, and I represent Robert and Wanda Alderson. The issue presented to you today is whether or not the origin of a body of water, a non-navigable private body of water, is relevant when determining the co-owner's surface rights. The plaintiffs, in this case Rhonda and Wanda Alderson, are also the appellants here today, and they would argue to you that the origin of that body of water is irrelevant. This case comes to you following procedurally, following motions for summary judgment, cross motions for summary judgment at the trial court. The trial court heard arguments of counsel and rejected the holding in Natalini. The motions for summary judgment were principally based on the two cases that have been briefed by the parties, the Beecham case and the Natalini case. The court distinguished the Natalini case based on the ownership, the co-ownership of the body of water, and found that the Beecham case was a better reason of law. The case was then appealed, and the appellate court disagreed with the trial court and reversed them and entered summary judgment in favor of the defendant. The appellants, the plaintiffs, ask you to reverse the third district appellate court and affirm the trial court's decision, granting summary judgment in their favor. As I said, the issue before you is whether a body of water's origin should be considered when determining the co-owner's surface water rights. Factually speaking, this is a case where a small creek emptied into a small depression and was then mined by an individual named Mr. Fatland. He purchased the property in 1968, mined the property for a period of years, and constructed approximately a 20-acre lake. After he was done mining the quarry, he sold off several lots to the other defendants in this case in 1981. There was a parcel of land that remained to a third party, a farmer, and that parcel of land was bought by Robert and Wanda Alderson in 1998. Since that time, since 1998, Robert and Wanda Alderson have used the surface waters of the lake in conjunction with the other property owners. They've constructed a boat ramp, they've constructed a swimming dock, they've constructed a retaining wall along the beach that separates the beach from their actual grass area, and they've used a pontoon boat and jet skis similar to those used and operated by the other owners of the lake. Mr. Buck? Yes, sir. The defendants owned the quarry, right? No dispute as to that? Correct. They paid taxes? They did. They paid insurance on the quarry? Yes, sir. Now, does that in and of itself take this case away from the Beecham decision and more into the realm of Nottolini? It does not, because there was a portion of that quarry that was owned by a third party. The record will reflect that not only do they admit that the plaintiffs and defendants are adjacent owners of portions of the quarry, but also that it was the defendants in construction of the, what I would call the earthen box that was the quarry, actually constructed that area that was on the third party's property that then became part of this now body of water that we're arguing about. That connection is referred to as a sliver, I think, at some point in the briefs. Mr. Stephenson, my opponent, characterizes it as a sliver. Yes, sir. It's difficult to do, but can you describe the piece of property for us? Yes, sir. I think that's a difficult question, but if you can, it would be helpful. To give you a graphic depiction, it is a large enough piece of land so as to allow for a boat ramp, a dock on the surface in the water, and a beach. And actually, if you were to look at the individual frontage of each of these parties, both the plaintiffs and the defendants, the plaintiffs actually have the longest strip of lake frontage of any single person. So it is, despite Mr. Stephenson's clever characterization, not a sliver. What is the frontage? I believe the actual frontage is 240 feet. And of the entire quarry? It's a 20-acre lake. I don't know the actual circumference of the lake. I apologize. The Aldersons are situated on one side, and the five defendants are situated on the other side. Did the defendants ever object to the use by the plaintiffs? Yes, sir. There was a prior action. Was it a 1998 lawsuit? Yes, sir. They sought adverse possession and ejectment. They lost. They appealed. They lost. They applied for review to your court, and they were denied. The plaintiffs, have they ever paid maintenance or taxes or insurance on the quarry? We've never gotten that far. I would suggest to you that that would be along the lines of the second component of Beecham, which is how do you interfere with one's reasonable use and enjoyment. And that's actually procedurally a portion of this case that when we argued the motions for summary judgment after Nottolini was decided, we knew that this issue had to be addressed, because there was no point in going any farther if this issue wasn't addressed. That would be part of the declaratory judgment in the Declaration of Rights of the Parties once this issue regarding surface water rights is determined. The law in this case, I would suggest to you, those are the facts, and I don't believe there's any dispute as to those facts. The arguments. Excuse me. Would there be anything to prevent the defendants here from making it a quarry again? I mean, operating a commercial venture? Yes, ma'am. The defendants entered into a PUD agreement, a planned unit development agreement, with Will County. That planned unit development agreement contemplates, and is part of their ordinance, that the lake will be preserved as open space. And I have cited to the record that portion of the staff report, which was relied on for the granting of that planned unit development, which states that because it will be preserved as open space, it will not negatively impact any adjacent property owners. So since, in the prior litigation, since the Aldersons have been determined to be adjacent property owners, if they were going to try and amend, they could certainly try and amend their PUD agreement, that's for sure. They would have to overcome the burden of the negative impact of operating a quarry on what is now a residential development. And I would also point out that in the record it is clear that one of the defendants has actually sold their property, they listed it for sale as a lake property, and now there's, they have not been brought into this lawsuit as we proceed through the appellate proceedings, but they would be a sixth party, and this is part of my argument, they've now, one of those defendants has now sold their property to somebody who bought it as a residence, advertised for lake use. So I would argue to you, factually, they will not be able to meet that burden, and legally they cannot change it either. And they have taken the actions to do that. Now the Beecham case I would argue to you is controlling here, and I would argue to you, does not necessarily have to overturn Natalini. I think that Natalini and Beecham can actually peacefully coexist. The Natalini case was decided by making a finding that the body of water was not natural, was man-made. I don't think, I would suggest to you that the Second District had to make that finding. In the Natalini case, it was found that there was only one owner. Central to the Supreme Court's decision in the Beecham case was the fact that there were co-owners. In the Natalini case, the single owner certainly had a right, and I would argue to you, had a right to put a fence around his property. Natalini does not have to be overturned for you to state that the Beecham case, which defined a body of water, not a lake, but in its holding a body of water, can be extended to those situations which are now before you in this case, that being what is arguably a man-made body of water. The Third District. Counsel. Yes, sir. In initially reading this, it was my conclusion that the ultimate issue in the case was whether the definition of lake had to be, lake was natural and if it was man-made, it wasn't natural and therefore was not a lake. Correct. And the dissenting judge in the appellate court would change the definition of lake to a considerable body of water, and without regards of whether it was man-made or not. That's correct. Is that your position as well, by the way? It is my position because I do not believe, I would argue to you that you do not have to define the origin because we're talking about a property right. We're talking about co-owners of lake bed over which there is a body of water. This particular property is man-made because first they dug the hole, huge hole. Yes, sir. And then the creek came in and filled up the quarry. And the rainwater. It naturally filled up. Yes, sir. 20 acres. Yes, sir. Okay. And I'll ask counsel the same question in trying to determine what the distinction means between man-made and natural. And I know that there's a large lake in southern, or a large body of water in southern Illinois that's from surface mining. Yes, sir. I think it's kind of a resort area called Rend Lake. And my serious question, and it is, regardless of the size of this lake, if it's man-made, it would not be for legal purposes a lake. And the law that affects lakes would not affect that large body of water. And if the definition of lake is man-made, that would be true, wouldn't it? Yes. Whatever I said. You're correct. And that's the way that because the Beecham case doesn't specifically address the body of the origin of Lake Zurich, it makes a finding that the Illinois Supreme Court was going to adopt the civil rule as opposed to the common law rule for that body of water. And because it's silent as to its limitation, if you will, on a natural body of water, that question is out there. And there is case law that says if it is a man-made, then repairing and littoral rights do not apply. That's clearly the law. I would not disagree with you at all. What we're arguing here is that the intent of Beecham was to preserve natural resources and give the most access and make them the most beneficial for all parties involved. And in this case, you have a quarry, which has now been turned into, or in your case, a strip mine, which has now been turned into a recreational body of water. I will do my very best to not call it a lake so we don't confuse it. But it is now a recreational body of water. What the defendants propose and what the Natalini case suggests is that when you determine that it's man-made, you can then put up fences and you can section it off and you can subvert what was the principle and purpose behind the Beecham case, which is to have the greatest number of people using the greatest amount of surface water. Our argument to you is that that should not be the case, that the origin of the body of water is irrelevant when you look at first ownership and then use. And that's the two-part test in Beecham. Yeah, and that was going to be my question. As far as the ownership goes, and we've talked, you know, a little bit about this, is there any dispute that the defendants are really the owners? Oh, I think that there is. No, I think that there is no dispute that they are adjacent owners. I would cite to you the record, the common law record page 1. Well, owners, I mean, we've talked about the taxes, the insurance, and what have you, and you say that's still at issue, but wouldn't there have to be a finding of this court that there's an ownership interest that the plaintiffs have in this case? Yes, I think it's necessary to our theory that when you are determining the rights under Beecham, that case was decided on the basis that Diana Beecham was an owner of Lakebed, as were the defendants in that case. And so, yes, it would be necessary, and that's been our position. Well, what does this court look at to determine outside of, you say that he calls it a sliver, whatever it is, what determination do we make that there's an ownership interest? Obviously, the defendants are going to get up here and say, we pay the taxes, we pay the insurance, we pay the maintenance, we built the thing, right? Well, but the defendants didn't build it with a purpose for making it residential. Mr. Fetland constructed it as a process of mining. What I'm saying is an issue of ownership is all I'm talking about. Yes, sir. What do the plaintiffs have on their side as an issue of ownership? That they have insurance for their portion of the lake that they have. They pay taxes on their portion of the lake. They have constructed a boat ramp. They've constructed a dock. They've run a boat on the property. They've run jet skis on the property. They've swam in the water. They've used the water just as consistently as the defendants have used the water. Is there anything about that 1998 lawsuit and the fact defendants didn't prevail that is part of your argument with respect to ownership? Part of that lawsuit was to determine that they did not own the water that went into Lake Bed, and that is that the defendants had acquired that by adverse possession. That was their argument, and quite frankly, it has not been through the summary judgment stage and the appellate court stage, an argument from either side that these parties are not adjacent property owners of a portion of the Quarry Lake that Mr. Stephenson argues in one point. He puts a percentage on it, 99% to 1. In the Zurich case, it was 240 acres of which Diana Beacham owned 20%. I would argue, based on my recollection from my days in law school, that principles like this are tested by cases that push it to the extremes, and I would say to you that the first argument has to be, are there co-owners of the lake? If they are co-owners, excuse me, body of water. Are there co-owners of the body of water? If there are co-owners of the body of water, what is its use? In this case, the defendants, by their very own conduct, have turned it into a recreational body of water. They have enacted an ordinance, a PUD. They have rezoned the property and preserved it as open space for that purpose. So clearly everyone's intent, if there's an element of intent that we're getting to here, is to operate this as a recreational facility in conjunction with their residential homes. I think the, I would argue to you that in the third district, in the Hasselbring case, there's two individuals in that case, and there's one pond, or there's three individual owners, there's one pond, a fellow to the north, Mr. Balding, and then a fellow to the south, Mr. Hasselbring. In that third district case, and this is one of the cases that I relied on, Mr. Balding at the top actually increased his portion of the pond. And in following the Beecham case for the purposes of deciding a case which dealt with accretion, but also dealt with surface water rights, the third district followed the common, or excuse me, the civil law rule that was announced in Beecham. And they also did that in a case, not the third district, but the fifth district, in the case of Statler v. Catalano. In that case, you had two property owners where a lake split their property, their property line split the lake, excuse me. And in that case, the defendant wanted to put up a fence to hold in their cattle. The defendant in that case did not prevail, the plaintiff prevailed, the fence got removed. But the defendant made the specific argument that the Beecham case was limited only to natural bodies of water. And the fifth district court rejected that. They said, no, we've looked at that, there's no support for that contention. And that's right in the decision where they reject the contention that Beecham is limited. And it gets back to my previous argument as to why Beecham should not be limited. Beecham should not be limited because the first question is ownership. And in this case, the defendants totally rely on Nottolini. The third district totally relied on Nottolini. They never focused on the true question of ownership.  Because had they just solely looked at the issue of ownership, they would have decided the case right there. And I would, thank you, I would bring that up to you because in the defendant's argument, they bring to your attention a case from Iowa, the Ore case. And in that case, Iowa adopted a common law rule with respect to this type of situation where a quarry was then turned into a recreational lake. And the reason that I would suggest to you that that rule should not be adopted here is because you will then have two separate rules that will have to be applied. You will have a civil law rule for natural lakes, and you will have a common law rule for man-made lakes. And it will add another level of contention. It will add another level of confusion, if you will, to what is now a very straightforward decision. You look at the body of water. You decide who owns it. And from there, you determine whether or not one party or the other is interfering with the reasonable use and enjoyment of the other party's right to use the surface waters. It's a very straightforward test under Beecham, and it should not be disturbed. Their argument that non-linear applies will essentially create or revive that common law rule for the purposes of all these natural resources which are now being created as a result of the regeneration of these quarries and strip mines that are now being turned into recreational lakes. And that will create more confusion and add, what I would suggest to you, unnecessary arguments regarding who has surface water rights and what those surface water rights are. For those reasons, we would ask that you would reverse the decision of the Third District Appellate Court and affirm the trial court's granting of summary judgment in favor of the plaintiffs, Robert and Wanda Alderson. Thank you. Thank you, Mr. Burke. Mr. Stephenson. Your Honors, Mr. Clerk, Mr. Burke, may it please the Court, it's clear that this Court adopted the civil law rule for Illinois in the 1988 Beecham Cage, which is factually so distinguishable from this instant case. There it was a natural body of water. It was a lake. Two hundred and forty acres, multiple owners, the minority owner being 20% of the lake bed. Now, the Second District Appellate Court and Natalini and the Third District Court below in this instant case, in essence, really correctly followed the application of the civil law rule because if you look at other states that have also adopted the civil law, the Supreme Court of Minnesota, for example, said civil law applies to natural bodies of water. When they were confronted with a man-made body of water in the Lake Mill Locks investment case, they reverted to the common law rule. That is what is important. Basically, there's two grounds on which we would suggest this Court look at. One is, first of all, origin, and secondly, disproportionate ownership. And I would point out that in the Beecham case, this Court in 1988 recognized disproportionate ownership. In their decision, they said, here's the civil law, here's the common law. We know that the common law is generally applied to those cases in which there is disproportionate ownership. They then went on to discuss the pros and cons and said, in this case, we're going to apply the civil law rule because there is no disproportionate ownership and it is a natural body of water. With regard to the ownership, there are at least five parcels or five owners around this body of water. Is that correct? What happened, Your Honor, is back in the 70s, Mr. Fatlin operated a quarry. When he decided to retire, he created five separate parcels at the south end of this particular quarry, and those are individually owned by his friends. They all own the quarry itself through a trust, and they pay the taxes. They pay the insurance premiums. They pay the maintenance. They pay to stock the fish. So they would be considered the owners of the lake bed except for the sliver that was carved out, inadvertently I take it, by the construction by Mr. Fatlin? Correct. I would only say, though, that they would be considered owners of the entire quarry because there is no lake bed if there is no lake. And that's exactly what the Nottolini case looked at. The Nottolini case is directly on all fours with this case because the Nottolini court and the trial court in Nottolini both looked at an area of land which was, they used the term, denuded from plant life because of the constant wash of the water up on the shoreline. But they said they didn't really need to get to whether that was ownership or not because they looked at the origin, and they said this isn't a lake. It is a manmade structure. All right. Now, I'm sorry? As long as you did stop. How does it differ from a strip mine lake? A strip mine lake? Your Honor was describing a strip mine lake downstate. I mean, there's a similar strip mine in the area of Cole City in which residential development. Your view is that those would be manmade lakes, though? Those are manmade. Manmade bodies of water. Absolutely. And I slightly disagree with Mr. Buck as far as the origin of the water that filled this quarry. It was actually filled from rain. I mean, there's no stream north or south of it. It flows overland into some ditches, but that's just because there's a depression that was created by a person, specifically Mr. Fatlin with a steam shovel. And the only reason, and I use the word sliver because when you look at the record, you'll see it is a tiny little sliver. He said 1%. I believe my words are far less than 1% in comparison to the 21 acres of the quarry. And it was that little sliver was created by the slip of the steam shovel as it came up. The one person who sold and who's now advertised as lake property, is that person one of the five? Correct. Shared in the ownership of the quarry as well? Correct. And when that person sold, they also passed, along with the deed, the rights through the trust. There is no such passage of that in this case with the Aldersons. None whatsoever. Now, the other civil law states, such as Minnesota, does not extend the civil law rule to man-made structures. And as I said, that's the Lake Mills Lock Investment case. I've also cited West Virginia and Virginia, or within the West Virginia case, they talk about the Virginia case, in which there is also no civil law rule for disproportionate ownership. And as I indicated, the Beecham, the 1988 Beecham Court, recognized this. Now, why treat them differently? Why treat natural bodies of water differently than man-made? Number one, I would suggest that Lake Zurich, which was dealt with in the Beecham case, was probably created by glaciers. We know without a fact that the quarry here was created by the toil of human labor. Sweat, time, money. You should treat them differently to recognize and respect that human endeavor. Respect the effort by respecting the ownership rights. Secondly, I believe it's important to restrict lake, the term lake, to natural bodies of water, in light of the new numbers of artificial detention ponds that are being created, and also in light of the fact that now we are getting artificially created bodies of water with residential subdivisions built around them. You know, it's important to recognize the rights of the owners and of the homeowners' associations in these situations, especially the right to restrict and regulate where they've taken maybe an existing wetland and expanded it for the detention purposes, or an existing small body of water and expanded it. It's important to respect those homeowners' rights to protect themselves against liability. Three, I think that we need to continue to recognize the longstanding property rights, and I cited my case, I believe, at the city of Dixon back in the early 1900s. Owners pay taxes on this 21-acre quarry. They pay insurance premiums. They pay maintenance. They stock the fish. There's 21 acres of responsibility that they have to handle, and that should equal 21 acres of their right to utilize that land. Anything, Mr. Stevenson, about the 1998 lawsuit that impacts one way or another in this case? Well, in my view, I think it's important to say that as soon as the Aldersons attempted to trespass onto their land, they were calling police. They started with this lawsuit. In 1998, the lawsuit started. It ended with a 2003 Third Appellate Court decision, which I believe was based on the evidence provided in that adverse possession case. I was not involved in the case at that time, but when I first read it, my first inclination was, my God, how much more open and notorious possession of land can you have than to take a steam shovel and take it away? But I believe that Rule 23 decision was based on the type of evidence. Now, that decision came out in 2003. The beginning lawsuit in this case was also begun in 2003. The first one was Fatlin v. Alderson on adverse possession. This is Alderson v. Fatlin under different issues. So there has been a continuous objection to the trespass from the very, very beginning. Does it matter how much of the surface, or not the surface, but how much land that the other party would own that's on the edge of the quarry? I would respectfully say most definitely. That's the disproportionate ownership that the Beecham Court recognized in its 1988 decision, that Virginia recognized in the Wachowski case. And Wachowski, there was 1.3 acres versus 28 acres. They saw that as disproportionate ownership. The Aldersons owned far less than that. In the Ours case, which comes from West Virginia, which I've cited in my brief, they used the terminology of 2% versus 98%. Again, if you look at the survey, which is a part of the record, the amount, the sliver that is owned by the Aldersons far less than 1%. And, in fact, you know, he said they put in a boat dock. They couldn't even float a boat in their part because they had to dredge it out in order to have a boat to float. And I just need to correct just slightly. Mr. Buck came up with his new box theory. Actually, when you build a sand quarry, it's a giant V. And it's the deepest in the very center because sand flows down. I learned that from my client. So in this particular case, that sliver is actually the edge of the uppermost part of the quarry wall, which at its deepest point extends approximately six feet in and extends not, you know, to my recollection, not the entire length of the ownership of the Alderson property. It starts in a little bit. But there's a pictorial view of that, I believe, in, well, at the record at page 208, there's an actual picture of the old steam shovel. And I believe in somewhere around, I think it's 209, it shows pictorially. And it is a sliver. Getting back to why treat things differently, I would submit that the protection of owner's rights will serve a societal goal. And the societal goal is to motivate people to want to create these type of habitats for bird life, for wildlife. You know, it's clear that the wetlands have been decimated, and this is a societal good. And so to induce people to create these things, to put in the sweat, the money, and the toil, you should decide that since it's a man-made structure that they are creating, they should also have the rights that go along with it. And lastly, this 21 acres prior to quarrying, it was clearly protectable as surface land. I mean, it was clearly protectable that you could put up a fence around it. Now, some human labor was involved, removing some of the sand to utilize it. That exertion of human labor should not change the same protection that was there in the very beginning. And I would submit that it is the exact same piece of property defined by meets and bounds in the original deed, when it was flat land, as opposed to what it is today. So the use of that labor to quarry should not be used to remove the protection that it clearly had. Now, with all due respect to Justice McBride, her suggestion of dictionary usages to try to define the word lake, I believe should remain in those type of cases where appellate courts are trying to determine what is the intent of the legislature and what is the common usage of words. It's different in this type of case. When you're looking at littoral rights or riparian rights, I would respectfully submit that we should look at learned treatises, such as Amjur, that I have cited in my brief and that the Natalini case depended on in its decision. Now, by application to the county of Will, they can clearly return to quarrying again. And one of your honors had a question about how it would affect surrounding property. This property is located immediately adjacent to the Braidwood Nuclear Plant. I believe Tiger Woods could probably hit it with a good drive. It's that close. There would be no negative impact because this is an industrial area. I mean, after all, this was a quarry that after the people retired, they put a little area which was residential. So I would submit that there would be no negative impact. And who knows? I don't know. Maybe technology might change and this particular sand which came out of this quarry was specifically, I guess it was a special kind of sand which was really good for road building at the time, and that's what it was used for. Well, maybe technology will find a way to take this sand and convert it to energy, and if that's the case in the future, clearly it will be opened up as a quarry again. Now, council suggests that we look at current usage, and my humble suggestion is even if we look at current usage, this is a quarry. It's always been a quarry. It will continue to be a quarry. You cannot change this into a lake. The glaciers are long gone. My clients, five retired couples, had, you know, peacefully existed for, you know, since the 80s. As I said, paid taxes, stocked the fish, paid insurance premiums, and have immediately sought to prevent the trespass of the adjacent property owners. And really, when you think about it, what we. Is there more than one? I'm sorry? Is there more than one homeowner? There are. The trespass of the homeowners. Well, the trespass of the homeowners, meaning the Aldersons and everybody they invite over. They're invitees, you know. And I mean, really, if you sit back and look at this, what we are dealing with today is a request for a group of people who live adjacent to have free trespass over 21 acres of property that was created by someone else for free. As I said, it was a slight error in moving the steam shovel that allowed that sliver to cross the property line, and that was determined during the first. Are you suggesting you really analyze this like we would if you'd build a garage on the land and extend it onto their property where you might have some liability for what part of the property you appropriated or had the part of the garage roof, but it wouldn't give them the right to use your garage? Correct. I agree. Exactly. I also want to add in my brief time left that I would also ask that you consider the justice and equitable principles. Clearly argue that owners who toil and pay for a structure, pay the costs associated with it, should have the right to utilize that structure as well as protect their liability. We need to remember that Nottolini started out, unfortunately, with a tragic drowning, which then prompted the quarry owner to want to put the fence up. The Fatlands and their friends have been trying to prevent that from happening in this case. They put up a fence and it was ripped out. It's one of the issues that will be dealt with by the courts when this goes back. Now, the Orr case tells us that the civil rule came from Scottish laws governing the locks, and locks are naturally occurring over there, probably created by glaciers like Lake Zurich was. But this Will County quarry is 100% different and should be treated differently, just as Minnesota treats theirs. Based upon the case law from other states, considering the history of the civil law rule, as well as that quote from the Beecham Court acknowledging disproportionate ownership claims, as well as principles of justice and the equitable principles, we respectfully ask that the appellate court ruling below be seen as having been correctly decided, and that the law applicable was correctly applied, and we respectfully request that the order and decision of the 3rd District Appellate Court be affirmed. Thank you, Mr. Stevenson. Mr. Buck, rebuttal? The first thing I want to address is a comment that was made by my opponent. He indicated that there was previously a fence in the lake that was ripped out, and I just want to be clear that, so the court is clear, that the defendants in this case did construct a fence across the lake, and this action was filed and they voluntarily removed it during the pendency of this action. I believe that there's actually a picture in the record depicting the fence, and you'll see the actual area of the lake that is cut off. I just didn't want any perception to be created in this court that the plaintiffs had done anything contrary or illegal in terms of ripping down a fence or doing anything volatile against the defense. That's clearly not the case. In addressing Mr. Stevenson's argument, he points to exactly the reason that the Beecham case was decided. When you look at that decision, first off, he tries to make a point about disparate ownership. In that case, there was a 20% owner and an 80% owner. In that case, the 20% owner was actually earning money on the lake by running a boating business on the lake. The adjacent property owner was a homeowners association that was paying dues to maintain insurance and the lake. The Supreme Court did not feel that the disparity of ownership in that instance was sufficient to not apply the civil law. And they, in fact, implied the civil law. And when you read that decision and you go into that head notes, you're going to find that there isn't a discussion where they make a finding that this is not a disparate ownership issue. That's not even discussed. They pointed out as a rule that the common law states have an issue that the common law states have acknowledged, but it is not a determinative factor. And I would argue to you today that it is ownership of the lake bed that is the primary determinative factor. And that gets to my second point about Beecham. Philosophically, Beecham was decided, I would argue to you, and adopted because the civil law promotes rather than hinders recreational use and enjoyment of the lakes. That's right from the case. That was the principle upon which Beecham was decided, not to have a system under the common law, which was if you have a lake and the property of the lion runs right down the middle, you have your surface water rights over your property and I have my surface rights over my property. No, they said that doesn't make any sense. The surface water rights should be shared by everybody because that promotes the use of the lake. Every single point that is raised by the defendants is an attempt to revert back to the common law argument and to deny people access and to really overrule Beecham and the intent of Beecham, which is to provide access, which is to promote the use. And certainly in situations, and I would take exception with counsel's argument, that anybody is ever going to misinterpret or have a problem differentiating between a water detention pond in front of a strip mall and a quarry that has been turned into a residential subdivision with $300,000 and $400,000 houses with docks and boats and is being used for recreational purposes. Those two things are mutually inconsistent. So to have a definition, as he suggests, that requires or have a decision that requires the definition of a lake so people don't make those mistakes really is illogical. The whole purpose behind Beecham was to promote the use and, in this case, the application of the origin of the body of water. Mr. Buck? Yes, sir. Mr. Stevenson alluded to the fact that his clients acquired the property, the quarry had a meets and bounds description. I presume your clients acquired their property with a meets and bounds description. If this were a lake on a water course or a natural lake, origin was important. Do people acquire title to their lake bed with their deeds, and does that make any difference? I would suggest to you that it doesn't make a difference when you are acquiring your property pursuant to a deed that includes a description of the lake bed. In this situation, had the steam shovel not cleared or created the slope or the sliver, would your property have been on or would your owners have owned part of the lake bed without that sliver having been carved out, and does that make a difference? I think it does make a difference. First off, I don't know the exact answer to your question, but for the purposes of argument, I'm going to assume no, that they wouldn't have. Let's argue it that way because that's the Nottolini case. In Nottolini, they didn't have riparian rights. They may have had littoral rights to use the shoreline, but they did not have riparian rights. And in the absence of those riparian rights, they didn't have any surface water rights. In this case, clearly, whether it was through the act of the defendants in creating the riparian rights, whether it was accretion or whether it was the, well, I guess that would be accretion, the dissolving of the shoreline, they had riparian rights. They constructed a boat dock. That has been acknowledged by the defendants. So I do think it matters, and for the purposes of answering your question, I would argue, let's argue that they would not have. In this case, they do, and the defendants acknowledge it. So that brings to my question. What if Mr. Fatlin had never subdivided or made ahead of PUD? In other words, if he continued, he owned the property, it was operated as a quarry, maybe he wasn't operating it anymore, would your position still be the same? If Mr. Fatlin, if I understand your question, Your Honor. I'm just saying, let's have all the facts be the same. Your people, the scoop shovel came out of the property, just exactly what you have now. But what if nobody lived over there? In other words, they didn't have any boat docks and so forth. Would your position be the same? Would they still acquire those rights because they actually have some of the water? I would argue to you that that is very analogous to what you have in Beecham, where you have one person running a business and the other one having a residence. In this case, it would just be the opposite. If Mr. Fatlin was still operating the quarry and the Aldersons acquired property with riparian rights, they would have rights to the surface waters. Whether or not they would be able to boat and do things that might interfere with his reasonable use of enjoyment of the surface water rights as a quarry, I don't know how he could quarry if it was actually a lake, but let's just run this argument out. That would be a determination, and that's where you get into the second part of the Beecham argument. And I would suggest to you that the reason that the Beecham case should be applied to situations like this, where you have a man-made body of water, is because that is an objective test. You can determine ownership, and then you can determine what is reasonable use. In the Statler case, it was you can't put up a fence for your cattle because that deprives a person of the entire use of the water. In the Hasselbrin case, the defendant wanted to empty it and turn it into a natural wetland, and the two plaintiffs were successful in having the court find that that was interference with their reasonable use. So I think that's why the civil rule, the rule announced in Beecham, is the principal rule that should be applied in cases where you have a non-navigable private body of water that is not of natural origin. I don't think the origin matters. It should be ownership, and then from there, what is the reasonable use. Are you contending that the Fatlands cannot now drain this and use it again for a sand quarry because of the action it took with the county or for rights that your clients have accumulated over the years? Under my theory of the case, yes, because I would say that under Beecham, if they drained the water unless, well, yes, if they drained the water, they would deprive us of the use of the lake, which was the Hasselbrin case. That guy wanted to drain the water. He wanted to set up a wetland off of his property, and they said, no, you can't do that. So, yes, it would be because Beecham would apply in that instance. Legally, I would argue to you that because they have taken the affirmative steps to create the PUD and they have consented to the ordinance that now preserves that open space, I may have a wholly other legal argument as to the estoppel or some other argument that they can't do it based on the Will County Ordinance. But to answer the question that we have before us, because it would interfere with my reasonable use of enjoyment of the surface water rights, that they would not be able to do it, which is exactly the Hasselbrin case. Your Honor, thank you very much for hearing my argument today. I would ask that you would reverse the Third District Appellate Court and affirm the trial court's decision granting summary judgment in favor of Robert and Wanda Alderson. Thank you. Thank you, Mr. Buck, and thank you, Mr. Stevenson. Case number 104-772, Robert L. Alderson et al. v. Leo F. Batlin et al. is taken under advisement as agenda number 16.